# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

_____

| | |
|---|---|
| **In Re:** | **Bankruptcy Case** |
| REBECCA NUTTALL WHITE, | **No. 05-42598** |
| **Debtor.** | |

_____

| | |
|---|---|
| DARWIN JENSEN, | **Adv.  Proceeding No. 06-8002** |
| **Plaintiff,** | |
| **vs.** | |
| REBECCA NUTTALL WHITE, | |
| **Defendant.** | |

_____

## MEMORANDUM OF DECISION

_____

**Appearances:**

A. Elizabeth Burr-Jones, BURR-JONES LAW OFFICE, Burley, Idaho, Attorney for Plaintiff**.**

Rebecca Nuttall White, Twin Falls, Idaho, Pro Se Defendant

MEMORANDUM OF DECISION - 1

### *Introduction*

Darwin Jensen ("Plaintiff") filed a Complaint to Determine Dischargeability of Debt. Docket No. 1. In it, he alleged that chapter 7 debtor Rebecca Nuttall White ("Defendant") willfully and maliciously gelded a stallion owned by Plaintiff, and that the damages he suffered as a result, constitute a claim excepted from discharge in Defendant's bankruptcy case. The Court conducted a trial at which the parties appeared and presented evidence, testimony and argument. After due consideration of the parties' submissions, as well as the applicable law, this Memorandum disposes of the issues raised in this action. Rules 7052; 9014.[1]

### *Findings of Fact*

Plaintiff and Defendant were married in February 2000.

Prior to the marriage, Plaintiff engaged in the manufacturing of vitamin and mineral supplements for horses, as well as breeding and raising quarter horses. He also raised feed for the horses. He continues to breed and raise horses at the present time.

---

[1]    The references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001– 9036, as they existed prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 108-9, 119 Stat. 23 (Apr. 20, 2005), because Debtor's bankruptcy case was commenced on October 6, 2005, prior to BAPCPA's effective date of October 17, 2005.

MEMORANDUM OF DECISION - 2

Prior to the marriage, Defendant worked as a law enforcement officer in Utah for several years. Before that experience, since approximately age 20, she had been involved with, and received a steady income from, training horses.

When the parties married, Defendant moved to Idaho and took part in Plaintiff's horse business. During the marriage, Defendant made no decisions concerning the gelding of stallions as part of her role in the business.

In about March 2000, a colt was born in the parties' horse operation which they named Five Star Winken ("FSW"). Plaintiff considered FSW to be special for two reasons: first, he was a "dun" (i.e., buckskin in color), with a black mane and tail, black dorsal stripe and black legs; and second, he had a distinctive pedigree, in that FSW was a cross between the Winken Wayne line and the Jody Fairfax line of horses. While FSW's parents had not generated any particular amounts of income, nor accumulated any prize points through any of the various racing or roping organizations, his grandparents had both been, in Plaintiff's words, "famous" horses. Plaintiff felt FSW exhibited the features which made his grandparents famous: the speed of Winken Wayne and the cowhorse sense and speed of Jody Fairfax. In his opinion, this combination of brains and speed would make FSW desirable to those in the horse industry. He also thought FSW's prized

MEMORANDUM OF DECISION - 3

color and markings made the horse more valuable.

In February 2002, the parties separated, and in March 2002, Defendant filed for divorce. Defendant lived on the premises where the horse operation was conducted until June 15, 2002, when she moved off the property. At that time, she took a horse trailer and five of the parties' horses with her, including FSW.[2]

At some point during the divorce proceedings, the parties stipulated to the appointment of a master, who examined the marital assets and appraised their value. Ex. A. Although the record is unclear as to exactly how it came about, the horses were appraised by a man named Wade Zollinger on September 3, 2002. Ex. F. Mr. Zollinger valued FSW, not yet gelded, at $1,000. *Id.* It is undisputed that Plaintiff later sold FSW for $1,500.

In October 2002, Defendant had FSW gelded. It is undisputed that Defendant gelded FSW without Plaintiff's consent. Indeed, the record includes evidence that Defendant e-mailed Plaintiff prior to doing so, and that Plaintiff unequivocally directed her not to geld the horse. Shortly thereafter, Plaintiff retook possession of the horse, although he was later required by the state court to return him to Defendant.

---

[2] She actually took six horses with her, but one had apparently belonged to her or her son prior to the marriage.

MEMORANDUM OF DECISION - 4

A divorce decree was entered in February 2005.  In its written opinion, the state court noted that the only argument between the parties concerning the division of their property was "over 27 horses, which are community property."  Ex. A.  FSW was included by the court in this collection of community horses.  The court ultimately held that a sufficient number of the horses should be sold to pay the master's fee, and that the balance of the horses be awarded to Plaintiff.  As a result, FSW, now gelded, was awarded to Plaintiff.

The same year the divorce became final, Plaintiff commenced an action in state court against Defendant to recover his alleged damages resulting from the gelding of FSW.  Thereafter, on October 6, 2005, Defendant filed her voluntary chapter 7 petition, and the state court action was stayed.  Plaintiff commenced this adversary proceeding on January 6, 2006.

### Conclusions of Law

### I.  Preclusion

Issue preclusion "prevents 'the relitigation of issues actually adjudicated in previous litigation between the same parties.'" *Dominguez v. Elias (In re Elias)*, 03.4 I.B.C.R. 243, 246 (Bankr. D. Idaho 2003) (quoting *Littlejohn v. United States*, 321 F.3d 915, 923 (9th Cir. 2003)).  "The doctrine of issue preclusion 'protect[s] the finality of decisions and prevent[s] the proliferation of

MEMORANDUM OF DECISION - 5

litigation.'" *Id.* (quoting *Littlejohn,* 321 F.3d at 919).

The Supreme Court has held that issue preclusion applies in discharge contests. *Id.* (citing *Grogan v. Garner*, 498 U.S. 279, 284–85 n. 11 (1991)); *Roussos v. Michaelides (In re Roussos)*, 251 B.R. 86, 92 (9th Cir. BAP 2000). A bankruptcy court must apply federal law to determine the preclusive effect of federal judgments and must apply the same preclusive effect to a state court decision as other courts of that state would afford it. *Id.*

Ordinarily, a party seeking to assert issue preclusion as a defense has the burden of proof. *Berr v. Fed. Deposit Ins. Corp. (In re Berr)*, 172 B.R. 299, 306 (9th Cir. BAP 1994). In order to meet its burden, the party must "introduce a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action. Any reasonable doubt as to what was decided by a prior judgment should be resolved against giving it collateral estoppel effect." *Id.*

To determine the preclusive effect of the Idaho state court judgment this Court must apply Idaho state law. *Elias*, 03.4 I.B.C.R. at 247. Idaho law requires five factors to be met in order for a judgment to have preclusive effect:

> (1) the party against whom the earlier decision is
> asserted had a full and fair opportunity to litigate the
> issue decided in the earlier case; (2) the issue decided
> in the prior litigation was identical to the issue
> presented in the present action; (3) the issue sought to
> be precluded was actually decided in the prior

MEMORANDUM OF DECISION - 6

litigation; (4) there was a final judgment on the merits
in the prior litigation; and (5) the party against whom
the issue is asserted was a party or in privity with a
party to the litigation.

*Id.* (citing *Rodriquez v. Dep't of Correction*, 29 P.3d 401, 404 (Idaho 2001)).

During oral argument at the conclusion of the trial, the parties

discussed whether Plaintiff's claims against Defendant are precluded by virtue of

the state court divorce decree.[3]

In this case, any alleged damage to Plaintiff occasioned by the

gelding of Plaintiff's prized stallion occurred prior to the conclusion of the divorce

proceedings, and before the state court's order for the division of the parties'

property – in fact, several years before the court's property division was finalized.

FSW was community property, and was valued and awarded to Plaintiff in the

state court proceedings.  Therefore, the first element of issue preclusion is met: the

Plaintiff had a full and fair opportunity to raise his claim, that Defendant had

caused him financial damage by gelding FSW, in the state court divorce action.

The fourth and fifth factors of the test are also met, as it seems clear

---

[3]  Although Defendant did not raise the defense in her answer to Plaintiff's
complaint, or in any of her other pleadings, it is consistent with the principles underlying
this doctrine to permit a court to examine the preclusive effect of a prior judgment *sua
sponte*.  *McClain v. Apodaca,* 793 F.2d 1031, 1033 (citing *Evarts v. Western Metal
Finishing Co.*, 253 F.2d 637, 639 n. 1 (9th Cir. 1958), *cert. denied*, 358 U.S. 815 (1958)
(citations omitted)).

MEMORANDUM OF DECISION - 7

that there was a final adjudication on the merits in state court, and the parties to

the divorce proceeding were the same as those before this Court.

   As to the remaining two requirements, the Court simply cannot be

sure.  The difficulty with the application of the doctrine here is the inadequacy of

the record from the state court action submitted to this Court.  There is no

evidence concerning whether the issue of the value of FSW as an item of property

and as a part of Plaintiff's business in state court was identical to the issue

presented here.  Furthermore, this Court cannot discern whether FSW's value as a

horse and as a part of Plaintiff's business was actually decided in the prior

litigation.  The record simply does not disclose whether Plaintiff raised the issue of

the gelding of FSW, or its potential impact on his horse breeding business, in the

divorce court.  This Court cannot determine whether the divorce court even knew

of the gelding, or if it took that fact into account when dividing the community

property.[4]

   As an exercise of caution, under these circumstances the Court will

not speculate about whether the issue of FSW's value was actually decided by the

_____

   [4]   What is abundantly clear, however, is that in the final decree, Plaintiff
received exactly the property settlement he sought.  Ex. A.  As he clearly knew of FSW's
gelding in October 2002, the property division was not final until February 2005, and he
sought a particular property division and received it, it stands to reason that Plaintiff took
the fact that FSW was no longer a stallion into account.

MEMORANDUM OF DECISION - 8

state court.  The Court will therefore not deem Plaintiff's claims against Defendant

precluded.

## II.  The Elements of § 523(a)(6)

Under § 523(a)(6), a chapter 7 discharge does not discharge an

individual debtor from any debt "for willful and malicious injury by the debtor to

another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6).

"There are two separate and distinct causes of action in a nondischargeability

proceeding: one is on the debt, as determined by state law, and the other is on the

dischargeability of that debt, as determined by federal law."  *Roussos*, 251 B.R. at

93 (citing *In re McKendry*, 40 F.3d 331, 337 (10th Cir. 1994)).  Plaintiff must

show Defendant acted both willfully and maliciously in "damaging" his property.

*Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551,

554 (9th Cir. 1991).  As the elements are distinct, the Court will consider them

separately.

## A.  The Existence of a Debt

The first element of proof required under § 523(a)(6) is that the

complaining party be a creditor – that he actually hold a claim against the debtor.

*Busseto Foods, Inc. v. Laizure (In re Laizure)*, 349 B.R. 604, 607–08 (9th Cir.

BAP 2006); *Banks v. Gill Distribution Ctrs., Inc. (In re Banks)*, 263 F.3d 862, 868

MEMORANDUM OF DECISION - 9

(9th Cir. 2001)).   Under the Code, a debt is defined as "liability on a claim."  11

U.S.C. § 101(12).   A claim, in turn, is defined as the "right to payment, whether

or not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

unsecured . . . ."  11 U.S.C. 101(5)(A).  While a claim need not be reduced to

judgment to constitute a debt, the debtor's liability must be determined, even if the

amount of the debt is disputed.  *Geisler v. Pansegrau (In re Pansegrau)*, 180 B.R.

468, 471 (Bankr. N.D. Tex 1995).  "'[D]ebt for,' as used throughout § 523, means

'debt as a result of,' 'debt with respect to,' 'debt by reason of,' and the like."

*Cohen v. De la Cruz*, 523 U.S. 213, 220 (1998) (citations omitted)).

       In other words, Plaintiff has the burden of proving Defendant is

liable to him for damages even though the exact amount is unclear, in order to

establish the existence of a debt under § 523(a)(6).  Whether Plaintiff has a "right

to payment" is, in this context, determined by applicable state law.  *Butner v.

United States*, 440 U.S. 48, 55 (1979).  Plaintiff has not satisfied this burden.

       In September 2002, prior to the gelding, Mr. Zollinger appraised

FSW, and valued the horse at $1,000.  It is undisputed that Plaintiff sold a gelded

FSW for $1,500.  Thus, if the original appraisal is accepted as the value of the

horse, including any potential to produce income, Plaintiff was not harmed

MEMORANDUM OF DECISION - 10

economically at all, and would have no claim against Defendant.  On the other

hand, if the master's estimate of value did not consider the loss occasioned by

Plaintiff's inability to utilize FSW in his horse breeding business as a sire, as well

as potential stud fees, the eventual price obtained for the horse likely did not fully

compensate Plaintiff.

Plaintiff testified that while he has sold stallions for as much as

$10,000, FSW's value was "realistically" about $5,000 per year as a stallion.  He

offered no additional testimony about the basis for that figure,  *i.e.*, whether it was

stud fees only, or if it also included FSW's value as a sire in the horse breeding

and sales business.  The Court has no evidence before it concerning the amount of

stud fees Plaintiff expected to charge for FSW, nor the value which Plaintiff

projected could have been derived from FSW's services as a sire in Plaintiff's own

operation.

In response, Defendant testified that during 2000 and 2001, the

parties' horse business earned a total of $3,015 in breeding fees.[5]  She also testified

that the business charged a $300 breeding fee for the services of Five Star Joe,

FSW's sire.  In other words, while Plaintiff has testified what FSW could be worth

as a stallion, Defendant's testimony, supported with actual figures from prior

---

[5]  She testified that in 2000, the business earned $2,900 in stud fees, and in 2001,
a total of $115.

MEMORANDUM OF DECISION - 11

business years, calls Plaintiff's valuation into question.

On this record, it would be speculative to project the income Plaintiff's ongoing business would have derived from FSW's services as a stallion. That he would have gained some economic benefit is perhaps likely, but the extent of that income is, based upon the evidence, purely hypothetical. The fact that Plaintiff sold FSW as a gelding for $500 more than his estimated value while a stallion further calls Plaintiff's scant proof of economic damages into question.

Plaintiff bears the burden to prove, by a preponderance of the evidence, that Defendant caused him economic harm. Because the Court is left to speculate and hypothesize about any damages Plaintiff may have suffered, Plaintiff has not met his burden to prove the existence of a debt.

## B.  Willfulness

Even if Plaintiff could prove Defendant is indebted to him by gelding FSW, he has not shown Defendant's conduct was willful for purposes of § 523(a)(6).

"To be considered willful, the debtor must commit an act akin to an intentional tort under state law, and the debtor must intend the consequences or injury resulting from the act rather than just the act itself." *Farmers & Merchants State Bank v. Cracchiolo* (*In re Cracchiolo*), 00.2 I.B.C.R. 84, 87 (Bankr. D. Idaho

MEMORANDUM OF DECISION - 12

2000) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998)); *See also Spokane Railway Credit Union v. Endicott* (*In re Endicott*), 254 B.R. 471 (Bankr. D. Idaho 2000). The act must be more than reckless or negligent. *Cracchiolo*, 00.2 I.B.C.R. at 87. "[N]ondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original).

In the context of a nondischargeability action, the "willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." *Carrillo v. Su* (*In re Su*), 290 F.3d 1140, 1142 (9th Cir. 2002); *see also Elias*, 03.4 I.B.C.R. at 245–46.

It is undisputed that Defendant intended to have FSW gelded – it was no accident, and represented a conscious choice on Defendant's part. The record is less clear, though, concerning Defendant's subjective motive. Put another way, the issue is whether by having FSW gelded, Defendant intended to injure Plaintiff, or believed that injury was substantially certain to result.

As noted above, the evidence is, at best, equivocal regarding whether Plaintiff suffered an economic injury as a result of Defendant's actions. FSW was valued at $1,000 as a stallion and was sold for $1,500 as a gelding. Defendant had

MEMORANDUM OF DECISION - 13

been informed by Mr. Zollinger that FSW would be worth more as a gelding, and in one sense, it turns out he was.  Although, as noted above, there was surely the potential that Plaintiff's ongoing breeding and sales business could suffer economically with the loss of a horse he testified he intended to use as a sire.  The relevant inquiry here is whether Defendant appreciated and intended that economic injury to Plaintiff's business was substantially certain to result from her actions.  The evidence on that point is ambiguous.

Plaintiff testified that Defendant knew from the time FSW was born that Plaintiff intended to use him as a sire.[6]  Plaintiff also testified that he usually sold horses as stallions, so as not to limit the buyer's options, although Plaintiff did not indicate that Defendant was aware of this philosophy.  On the other hand, Defendant testified that, on the advice of Mr. Zollinger, one of the other horses in her possession was left a stallion because, in his opinion, that particular horse was of stallion quality.  In other words, the evidence is contradictory as to Defendant's subjective intent to harm Plaintiff or his business.

When all the evidence is measured against the preponderance

---

[6]  Defendant argued that she believed that Plaintiff had intended to geld FSW, and keep one of the other five horses she possessed during the pendency of the divorce as a stallion.  As a result, Defendant insisted, she did not have that other horse gelded.  However, this information was offered to the Court during Defendant's closing argument, after the evidentiary record was closed, and thus cannot be considered.

MEMORANDUM OF DECISION - 14

standard, the Court cannot find that Defendant subjectively believed that an economic injury to Plaintiff was substantially certain to result from her having FSW gelded.  No doubt, Defendant's actions were reckless under the circumstances, in that gelding can be done at any time; it would have been more prudent for Defendant to wait until the parties' property settlement was finalized. However, on this record, Plaintiff has simply not proven that Defendant intended to injury him, or his business, by what she did.  The element of willfulness required for an exception to discharge under § 523(a)(6) has not been met.

### C.  Maliciousness

"A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *In re Su*, 290 F.3d at 1146–47 (quoting *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001) *cert. denied,* 533 U.S. 930 (2001)); *Elias*, 03.4 I.B.C.R. at 246.  Plaintiff has also not proven, by a preponderance of the evidence, that Defendant acted maliciously.

Plaintiff cannot demonstrate that gelding FSW was "a wrongful act." Defendant testified that gelding is routinely done in the care and maintenance of horses.  There was no court order, or other legal restriction prohibiting Defendant from taking the action she did.  Furthermore, as determined by the state court,

MEMORANDUM OF DECISION - 15

FSW was community property at the time the horse was gelded.  Again, while it may have been the prudent course for Defendant to obtain Plaintiff's consent before committing to such an irreversible path, under Idaho law, she had an equal right to manage and care for FSW in her own way, as did Plaintiff.  Idaho Code § 32-912.[7]  Under these circumstances, the gelding was not a wrongful act.

Next, the Court must consider whether the act was done intentionally, and the evidence clearly supports a finding that it was.  The third element required to prove maliciousness is that the act must necessarily cause injury.  As noted above, the evidence indicates that Plaintiff's business possibly suffered some loss due to FSW's altered condition, but the extent to which has not been proven.  Therefore, this prong has not been met.

In addition, to prove malice under the Code, the Plaintiff must prove that the gelding was done without just cause or excuse.  Plaintiff has not met his burden on this prong.  Plaintiff testified that Defendant knew he intended to use FSW as a stallion from the time he was a colt.  There is also Plaintiff's uncontroverted testimony that Defendant sent him an email which informed him of her intent to geld FSW, to which he replied in such a way as to make it clear that

---

[7]  This statute provides that: "Either the husband or the wife shall have the right to manage and control the community property, . . . ."

MEMORANDUM OF DECISION - 16

he did not want the gelding to occur.[8]  On the other hand, FSW was community

property at the time, the horse was in Defendant's care while the divorce was

pending, and Defendant's right to decide FSW's fate was equal to that of Plaintiff.

Mr. Zollinger had opined to Defendant that FSW would be more valuable

as a gelding.  As it was yet undetermined who would receive the horse in the

property division, it was therefore not unreasonable for Defendant to attempt to

enhance the value of the horse.  Additionally, Defendant's purpose in keeping

horses was different than Plaintiff's.  Plaintiff testified he intended to use FSW as

a stallion, to perpetuate and facilitate his horse breeding business.  Defendant, by

contrast, was not interested in breeding and selling horses.  Her focus was on

training rope, ranch and reining horses.  She testified that she thought FSW would

be more manageable and easier to train as a gelding.

Defendant has persuaded the Court that she had justifiable cause to

geld FSW, and such testimony went unchallenged by Plaintiff.  Accordingly,

Plaintiff has not met his burden to prove that there was no just cause or excuse for

the action taken, which precludes the Court finding Defendant's actions to be

---

[8]  In the Complaint, Plaintiff alleges that Defendant emailed him and asked if she
could geld FSW, to which Plaintiff replied "[a]bsolutely not."  Complaint, ¶ 7, Docket
No. 1.  In his trial testimony, Plaintiff stated that he received an email from Defendant
which said, "we need to talk about gelding this horse [referring to FSW]," and Plaintiff's
response was "don't you dare."  Defendant testified that she has no recollection of
sending any such email.

MEMORANDUM OF DECISION - 17

malicious.

### *Conclusion*

Plaintiff failed to prove that Defendant caused him a quantifiable economic injury by having FSW gelded.  In addition, even if Defendant is liable to him in some amount for her actions, Plaintiff has not persuaded the Court that Defendant's conduct was willful or malicious as required for an exception to discharge under § 523(a)(6).  As such, any debt owed by Defendant to Plaintiff is subject to discharge in bankruptcy.

A separate judgment in Defendant's favor will be entered in this action.

Dated: March 2, 2007

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 18